**UNPUBLISHED**

**UNITED STATES COURT OF APPEALS**

**FOR THE FOURTH CIRCUIT**

LEROY JOSEPH DRAYTON,
<u>Petitioner - Appellant,</u>

v.

MICHAEL W. MOORE, Commissioner,

South Carolina Department of
Corrections; CHARLES M. CONDON,
Attorney General, State of South
Carolina,
<u>Respondents-Appellees.</u>

No. 98-18

Appeal from the United States District Court
for the District of South Carolina, at Charleston.
Patrick Michael Duffy, District Judge.
(CA-94-1608-2-23AJ)

Argued: October 30, 1998

Decided: January 12, 1999

Before MURNAGHAN, HAMILTON, and
MICHAEL, Circuit Judges.

_____

Affirmed by unpublished per curiam opinion. Judge Murnaghan
wrote a dissenting opinion.

_____

**COUNSEL**

**ARGUED:** Sheri Lynn Johnson, CORNELL LAW SCHOOL, Ithaca,
New York; David P. Voisin, Columbia, South Carolina, for Appel-

lant. Donald John Zelenka, Assistant Deputy Attorney General, OFFICE OF THE ATTORNEY GENERAL, Columbia, South Carolina, for Appellees. **ON BRIEF:** John H. Blume, CORNELL LAW SCHOOL, Ithaca, New York, for Appellant. Charles M. Condon, Attorney General, John W. McIntosh, Deputy Attorney General, OFFICE OF THE ATTORNEY GENERAL, Columbia, South Carolina, for Appellees.

_____

Unpublished opinions are not binding precedent in this circuit. See Local Rule 36(c).

_____

**OPINION**

PER CURIAM:

Leroy Joseph Drayton appeals the district court's dismissal of his petition for a writ of habeas corpus. Drayton seeks relief from his South Carolina convictions on kidnapping, armed robbery, and murder, for which he has been sentenced to death. We affirm the district court's dismissal of the petition.

I.

On February 11, 1984, Drayton, who was armed with a revolver, abducted Rhonda Smith from the Kayo gas station where she worked. After Drayton forced Smith to drive them around for a short while, they came back to the station, where Smith attended to customers who had been awaiting her return. Thereafter, Drayton abducted Smith again. This time, the two drove to an abandoned coal trestle, where, according to Drayton's confession, he accidentally shot Smith to death when he lost his balance and his gun struck a railing and discharged. The ensuing investigation revealed that money was missing from the gas station. These events led to Drayton's conviction for murder, kidnapping, and armed robbery, and he was sentenced to death. After the South Carolina Supreme Court set aside that conviction, Drayton stood trial a second time. The result was the same, a

2

guilty verdict and a death sentence. This time the South Carolina Supreme Court affirmed his conviction.

Following the denial of his petition for state post-conviction relief, Drayton sought a writ of habeas corpus in federal court. Upon the recommendation of the magistrate judge, the district judge denied Drayton's request for a hearing and discovery, granted summary judgment for the state, and dismissed the petition.

Drayton appeals, advancing a number of issues. He contends he was denied effective assistance of counsel at both the guilt and sentencing phases of his trial. He says the district court erred in denying him an evidentiary hearing. He argues that the confession admitted at his trial was obtained in violation of his rights under <u>Miranda v. Arizona</u>, 384 U.S. 436 (1966), and <u>Michigan v. Jackson</u>, 475 U.S. 625 (1986). He believes that the state trial judge erred in refusing to instruct the jury on manslaughter and that the judge's instructions led the jury to believe it had to reach unanimity on the question of mitigating circumstances. And finally, he argues that he was denied due process by the South Carolina Supreme Court because that court failed to conduct a proportionality review as required by state statute.

II.

Drayton argues on several grounds that he was denied effective assistance of counsel at his second trial. To prevail on any of the grounds he raises, he must establish (1) that the representation he received was deficient and (2) that he suffered prejudice as a result. <u>Strickland v. Washington</u>, 466 U.S. 668, 687 (1984). In evaluating Drayton's claim under <u>Strickland</u>'s first prong, we must assess his counsel's performance "from counsel's perspective at the time" of trial. <u>Id.</u> at 689. And, Drayton must "overcome the presumption that, under the circumstances, the challenged action `might be considered sound trial strategy.'" <u>Id.</u> (quoting <u>Michel v. Louisiana</u>, 350 U.S. 91, 101 (1955)); <u>see also Bell v. Evatt</u>, 72 F.3d 421, 429 (4th Cir. 1995) (citing <u>Stickland</u> for the proposition that "strategies devised after extensively investigating the law and facts relevant to any and all probable options are virtually unchallengeable"). To satisfy <u>Strickland</u>'s second (the prejudice) prong, Drayton must show that "there is a reasonable probability that, but for counsel's unprofes-

3

sional errors, the result of the proceedings would have been differ-ent." See Strickland, 466 U.S. at 694; see also Cardwell v. Greene, 152 F.3d 331, 339-40 (4th Cir.), cert. denied , 67 U.S.L.W. 3374 (U.S. Dec. 3, 1998) (No. 98-6997).

Drayton mainly contests his lawyer's failure to introduce evidence of his relationship with Rhonda Smith. Before trial Drayton told his lawyer, William Runyon, that he had known Smith before the night of her murder and that he had met her on Bonds Avenue, where he had kept "her from being ripped off . . . by some folks in a drug deal." Drayton told Runyon that he and Smith "were friendly" after that and that "he would go by the Kayo station [where she worked]." Runyon, however, did not introduce evidence of Drayton's relationship with Smith at trial.[1]

On this issue we conclude that Drayton has not met either the per-formance or prejudice prong of Strickland. As the state and district courts found, Runyon's decision not to introduce evidence of Drayton and Smith's relationship was a reasonable strategic choice and was not the result of oversight, carelessness, or failure to investigate the case properly. As a general matter, Runyon wanted to pursue a differ-ent strategy than the one pursued at the first trial, which had resulted in a conviction and a death sentence. Rather than portraying the shooting as accidental, as defense lawyers at the first trial had done, Runyon wanted to avoid placing Drayton at the crime scene alto-gether. Runyon took this approach because he believed that Drayton's confession could be excluded and that, without the confession, the state had only a circumstantial case. Introducing evidence that Smith knew Drayton, Runyon feared, would make it "reasonably inferable that he was the black man that was there that night and that she would have gotten in the car and gone off with him."

_____

[1] At Drayton's state post-conviction review hearing several witnesses testified that Drayton and Smith had been romantically involved. Runyon testified that Drayton had not mentioned any romantic involvement with Smith and had not told him about many of the witnesses who could have attested to Drayton's relationship with Smith. Runyon acknowledged that Drayton did tell him about the drug deal, but Runion believed it would have been difficult to track down witnesses to that event.

4

Moreover, even assuming Runyon's performance was deficient, Drayton has not shown prejudice. Drayton initially indicated to the police that he did not know Smith. Thus, even if Drayton had introduced evidence of a relationship between himself and Smith, he would have been faced with trying to reconcile that evidence with his earlier statements to the contrary. In addition, Drayton's first trial, at which evidence of his relationship with Smith was introduced, resulted in a conviction and a death sentence. We therefore conclude that, even if Runyon had introduced evidence of Drayton's relationship with Smith, there is no reasonable probability that the outcome of the second trial would have been different.

Drayton raises one other guilt-phase ineffective assistance of counsel claim: he challenges his lawyer's failure to contest the forensic evidence. This claim is procedurally barred, however, because Drayton did not raise it in state court. See Mallory v. Smith, 27 F.3d 991, 994 (4th Cir. 1994).

Drayton also asserts several claims based on his lawyer's decisions at the penalty phase of the trial. First, he contends that his lawyer's failure to introduce evidence about his adaptability to prison constitutes ineffective assistance. Several death row guards could have testified that Drayton had not been a troublemaker. Had this positive testimony been introduced, Drayton argues, the jury might not have recommended a death sentence.

Here again, Drayton cannot meet either of Strickland's requirements. His lawyer made a strategic calculation not to call these witnesses, in part because their testimony would have resulted in the revelation that Drayton was on parole when Smith was murdered. Runyon also wanted to avoid revealing to the jury that Drayton had been held on death row. Finally, Runyon wanted to avoid the introduction of a damaging report by a doctor who felt Drayton would stay in trouble in prison.[2] Given these concerns, we cannot say that Runyon's decision not to introduce evidence about Drayton's behavior as a prisoner on death row was unreasonable. Moreover, Drayton has not established prejudice under Strickland. In addition to the problems

_____

[2] There is some dispute as to whether Drayton's lawyer would have had to make this report available to the state.

5

noted above, Drayton had in fact violated institutional rules at earlier times: he had violated the terms of his prison work release program, been involved in a fight, and engaged in sexual misconduct. Given all of these problems, we do not believe there is a reasonable probability that the jury would have recommended differently had Runyon introduced evidence of Drayton's good behavior on death row. Therefore, we conclude that Runyon's decision not to introduce this evidence did not amount to ineffective assistance of counsel.

Second, Drayton argues that Runyon should have requested an instruction that the jury had to give the term life imprisonment its ordinary meaning and that it was not to consider the possibility of parole in recommending Drayton's sentence.**3** At the penalty phase of Drayton's trial, it was revealed that Drayton had twice committed crimes while on parole. Runyon made a reasoned strategic decision not to seek an instruction telling the jury to disregard the possibility of parole in deciding whether to recommend life imprisonment. Given Drayton's behavior on parole, Runyon said that he did not want to "remind [the jury] of [parole]," noting, "[y]ou know, I'm not the esoteric appellate lawyer, I deal in the reality of life, I deal with what those jurors think, and that's what I've got to deal with." This was not ineffective assistance under Strickland.

Third, Drayton alleges that Runyon improperly failed to investigate Drayton's mental state, alcohol and substance abuse, learning disabilities, and hypoglycemia. Again, Runyon testified that his strategy was to present Drayton in a "positive" light (as did the lawyers at Drayton's first trial, for the most part). Runyon believed he had a very good jury for his client, and he said that he didn't want to "rock the boat" with negative testimony. Given the circumstances of this case, we cannot say that this approach was unreasonable.

Finally, Drayton argues that Runyon's closing argument constituted ineffective assistance of counsel. Even assuming deficient performance, however, there is not a reasonable probability that the outcome would have been different. We also reject Drayton's asser-

_____

**3** In other words, such an instruction would advise a capital jury not to question whether a "life sentence" might still mean that a defendant could be released on parole.

6

tion that the cumulative effect of the bad decisions by his lawyer constituted ineffective assistance. Runyon's decisions were simply not unreasonable when viewed from his perspective prior to and during trial. In any case, Drayton has not established that he suffered prejudice from his lawyer's actions. Thus, we agree with the district court that Drayton's Sixth Amendment right to counsel was not violated.

III.

Drayton next claims that he requested counsel at his bond hearing and that the police violated his Sixth Amendment rights by questioning him thereafter. Drayton confessed to shooting Smith shortly after the bond hearing, and his confession was admitted at trial. For the reasons outlined below, we do not believe Drayton's rights were violated.

The Sixth Amendment provides that an "accused shall enjoy the right . . . to have the Assistance of Counsel for his defence." U.S. Const. Amend. VI. This right is not limited to an accused's defense at trial. See United States v. Ash, 413 U.S. 300, 309-310 (1973). Instead, the right attaches at the initiation of adversarial proceedings and continues through all "critical stages" of the process. See Maine v. Moulton, 474 U.S. 159, 170 (1985) (noting that the Sixth Amendment affords a defendant the right to counsel after the initiation of adversarial proceedings because "[i]t is then that a defendant finds himself faced with the prosecutorial forces of organized society, and immersed in the intricacies of substantive and procedural criminal law." (quoting United States v. Gouveia, 467 U.S. 180, 189 (1984) (quoting Kirby v. Illinois, 406 U.S. 682, 689 (1972))).

In part because the right is so critical, the Supreme Court has held that police may not reinitiate interrogation of an uncounseled defendant after he requests the assistance of a lawyer. See Michigan v. Jackson, 475 U.S. 625, 635 (1986). The same rule applies whether a defendant requests appointed counsel or indicates that he intends to obtain private counsel. See Wilson v. Murray, 806 F.2d 1232, 1235 (4th Cir. 1986). Thus, if Drayton had effectively asserted his right to counsel in one of these ways, any reinitiation of interrogation by

7

police would have rendered his subsequent confession inadmissible at trial.**4**

Whether Drayton requested counsel (or indicated that he would retain private counsel) has been a matter of sharp dispute, and the bond hearing was not transcribed. At the suppression hearing at trial, Drayton testified that he requested appointed counsel at his bond hearing. A police officer testified that Drayton indicated he did not want appointed counsel and that he did not say whether he would obtain private counsel. The presiding magistrate judge said that when she asked Drayton "Can you afford an attorney, or do you want the Court to appoint one for you," he responded "I don't want one." The magistrate judge nonetheless noted that she was under the impression that Drayton would obtain his own lawyer. In fact, she said that "[i]f someone states to me . . . `I do not want an attorney,' I would in turn tell that person that I doubt if the judge would even hear a guilty plea without an attorney being present, you're going to have an attorney."

At the conclusion of the suppression hearing, the trial judge found "beyond a reasonable doubt that [Drayton] did not assert his right to counsel" at the bond hearing. We are required to afford the trial court's factual findings on this matter a presumption of correctness.**5** See Sumner v. Mata, 449 U.S. 539, 550 (1981).**6** As indicated above, the testimony presented to the trial judge on whether Drayton asked

_____

**4** In Michigan v. Jackson and in Wilson v. Murray, the defendants clearly and unquestionably sought counsel. See Jackson, 475 U.S. at 628 ("During the arraignment, Jackson requested that counsel be appointed for him."); Wilson, 806 F.2d at 1234 ("At the arraignment, Wilson indicated his intention to obtain counsel of his choice.").
**5** Drayton filed his habeas petition prior to passage of the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA). We therefore apply the pre-AEDPA standard of review to this case. See, e.g., Smith v. Moore, 137 F.3d 808, 812 n.1 (4th Cir.), cert. denied, 119 S. Ct. 199 (1998).
**6** Notwithstanding this presumption of correctness, we question the trial court's finding that Drayton reinitiated contact with the police. The record suggests otherwise. Were we convinced that Drayton reinitiated contact, we would find his Sixth Amendment rights waived without further discussion.

at the bond hearing for appointed counsel (or indicated would get counsel himself) is conflicting and, in some instances, confusing. In light of this, we cannot say that Drayton has offered anything sufficient to overcome the presumption that the trial judge's finding is correct.**7** Thus, the writ cannot be granted on the ground that Drayton's Sixth Amendment rights were violated.

_____

**7** The dissent accepts the trial court's factual findings but nonetheless contends that "[b]ased on the uncontroverted evidence . . . Drayton invoked his right to counsel, as a matter of law." See post at 18. This contention appears to be based on the state magistrate judge's "impression" that Drayton was getting his own lawyer. We disagree with the dissent that this "impression" can be taken as an "indicat[ion] . . . that [Drayton] intended to retain his own counsel." See post at 18 n.3. In any event, any such indication was ambiguous at best, see ante at 8, and the clarity with which a defendant must "assert" his Sixth Amendment right to counsel in this setting remains an open legal question. On the one hand, the Supreme Court has noted "that we should `indulge every reasonable presumption against waiver of fundamental constitutional rights,'" adding that "[t]his settled approach to questions of waiver requires us to give a broad, rather than a narrow, interpretation to a defendant's request for counsel -- we presume that the defendant requests the lawyer's services at every critical stage of the prosecution." See Jackson, 475 U.S. at 633 (quoting Johnson v. Zerbst, 304 U.S. 458, 464 (1938)). Under the Fifth Amendment, however, the Court has held that a defendant must invoke his right to counsel "unambiguously," see Davis v. United States, 512 U.S. 452, 459 (1994), an analysis that may carry over to the Sixth Amendment in these circumstances. See, e.g., Michigan v. Harvey, 494 U.S. 344, 350-51 (1990) (noting that "Jackson simply superimposed the Fifth Amendment analysis of Edwards onto the Sixth Amendment" and dismissing the idea "that there should be a different exclusionary rule for Jackson violations than for transgressions of Edwards and Miranda."); see also 475 U.S. at 640 (Rehnquist, J., dissenting).

The precedent, unsettled as it is, does not compel a conclusion contrary to the one reached by South Carolina's courts. This point is particularly important because we may not impose a new constitutional rule on habeas review. See Teague v. Lane, 489 U.S. 288, 306-08, 310 (1989) ("Unless they fall within an exception to the general rule, new constitutional rules will not be applicable to those cases which have become final before the new rules are announced."). Under Teague a rule is new if "the result was not dictated by precedent existing at the time the defendant's conviction became final." Id. at 301. We cannot say that precedent dic-

9

IV.

Drayton next raises two <u>Miranda</u> claims. First, he contends that police issued him a faulty set of <u>Miranda</u> warnings before he confessed. Specifically, the third time the warnings were given the police advised Drayton that anything he said could be used "for or against" him in court.

Under <u>Miranda</u> police must advise suspects of their Fifth Amendment right to avoid compulsory self-incrimination. <u>See Miranda</u>, 384 U.S. 436, 444 (1966). <u>Miranda</u> warnings, in their proper form, advise suspects that their statements "can and will be used against" them. <u>Id.</u> at 469. The Supreme Court has held, however, that the warnings need not be administered with absolute precision. <u>See California v. Prysock</u>, 453 U.S. 355, 359-361 (1981). <u>Id.</u> Notwithstanding this allowance for flexibility, "for or against" warnings must be discouraged because, in some situations, they may mask the adversarial nature of the interrogation. In <u>Miranda</u> the Court noted that the warnings were necessary, in part, to "make the individual more acutely aware that he is faced with a phase of the adversary system -- that he is not in the presence of persons acting solely in his interest." <u>Miranda</u>, 384 U.S. at 469.

In Drayton's case, however, we find that the "for or against" formulation was inconsequential. Earlier in the day police had twice administered correct <u>Miranda</u> warnings to Drayton, and, when asked whether he understood his rights, Drayton responded "Man, I understand the rights . . . ."

In his other <u>Miranda</u> claim Drayton asserts that police did not "scrupulously honor" his right to remain silent as <u>Michigan v. Mosley</u>, 423 U.S. 96, 104 (1975), requires. Drayton argues that police violated <u>Mosley</u> by questioning him several times in one day. In <u>Mosley</u> the police had administered warnings twice, with a two hour break in

_____

tates a holding that Drayton asserted his Sixth Amendment rights. For this reason, and because we must accept the trial court's factual findings, we cannot grant the writ on the basis that Drayton's Sixth Amendment rights were violated.

10

between. Id. The Court observed that they "resumed questioning only after the passage of a significant period of time," noting that "the police gave full `Miranda warnings' to Mosley at the very outset of each interrogation, subjected him to only a brief period of initial questioning, and suspended questioning entirely for a significant period before beginning the interrogation that led to his incriminating statement." Id. at 106-07.

We believe police behavior in this case is consistent with what Mosley allows. Police first administered the warnings when they arrested Drayton on February 16, 1984, between 7:30 and 8:00 a.m. When Drayton exercised his right to remain silent, the questioning stopped. Police administered a second set of warnings several hours later at headquarters. Again, when Drayton chose to remain silent, the police suspended their questioning. Finally, after Drayton had returned from his bond hearing and asked to speak with Lieutenant Frazier, an officer with whom he had had prior contact, Frazier administered a third set of warnings.[8] We therefore agree with the district court, which found no Miranda violation in this case.

V.

Drayton next contends that he is entitled to an evidentiary hearing in federal court because the judge who conducted his state post-conviction review proceedings was racially biased. A district court must grant a hearing if "for any reason it appears that the state trier of fact did not afford the habeas applicant a full and fair fact hearing." See Townsend v. Sain, 372 U.S. 293, 313 (1963); Cardwell v. Greene, 152 F.3d 331, 336 (4th Cir.), cert. denied, 67 U.S.L.W. 3374 (U.S. Dec. 3, 1998) (No. 98-6997); see also Sumner v. Mata, 449 U.S. 539, 545 (1981).

It appears to us that Drayton had a full and fair hearing in state court. The evidence and testimony were developed fully and were adequate to enable the state judge to make his findings; although the

_____

[8] It appears that police "interviewed" Drayton without giving Miranda warnings prior to his request to speak with Frazier. This fact is of little consequence here, however, because Frazier administered the warnings before Drayton made any incriminating statements.

11

judge did not believe witness testimony about the intimate nature of Drayton and Smith's relationship, we do not find the judge's disbelief to be indicative of underlying racial animus. Because the state court's judgment is supported by the record and because we believe Drayton had a full and fair hearing at the state court level, we affirm the district court's denial of Drayton's request for an evidentiary hearing.

VI.

Drayton argues that the state trial judge should have given an instruction on manslaughter. Drayton contends that, despite his own confession, in which he said that he shot Smith by accident, the evidence supported the position that he was provoked by Smith and shot her in the heat of passion. To support this argument, Drayton points to testimony that Smith signaled to customers that she would return soon, "suggest[ing] the importance she placed on her time alone with petitioner." Because Smith and Drayton could have been having a "serious personal discussion" on the trestle at the time she died, he argues, the judge should have given the manslaughter instruction. Id. The district court concluded that the record did not support such an instruction. If we were to reach the merits, we would agree with the district court.

Its dubious merits aside, this claim is procedurally barred because it was not exhausted in state proceedings. See Mallory, 27 F.3d at 994. The same rule holds true even when state courts conduct in favorem vitae review.9 See Matthews v. Evatt, 105 F.3d 907, 912-13 (4th Cir.), cert. denied sub nom. Matthews v. Moore, 118 S. Ct. 102 (1997); Kornahrens v. Evatt, 66 F.3d 1350, 1362-63 (4th Cir. 1995). In Kornahrens the court found a claim procedurally barred where the state court had conducted in favorem vitae review. The Court said that, absent a defendant's specific objections, it could not "determine

_____

9 **In favorem vitae** review requires a "painstaking[ ] inspect[ion of] capital cases to determine whether prejudicial error has been committed in a trial, irrespective of whether an assignment of error has been made by the defendant." Drayton v. Evatt, 430 S.E.2d 517, 519 (S.C. 1993). South Carolina courts no longer conduct this type of review. See Matthews v. Evatt, 105 F.3d 907, 912 n.4 (4th Cir.), cert. denied sub nom. Matthews v. Moore, 118 S. Ct. 102 (1997).

12

whether the state court has properly applied federal constitutional principles, or for that matter, whether the state court has even considered these issues at all." Kornahrens, 66 F.3d at 1362. In Matthews the Court similarly found barred a claim that the defendant had raised in a pretrial motion but had not raised on appeal. See Matthews, 105 F.3d at 912-13.

Drayton did not raise this issue on direct appeal. He nonetheless argues that because the court conducted in favorem review and because his issue was raised squarely at trial (unlike in Matthews where the claim was raised in a pretrial motion), his claim should not be barred. In other words, because his objection appeared in the trial record, he argues, we can be sure to a degree not possible in other cases that the state supreme court reviewed the issue. We decline to formulate a new rule of the kind Drayton suggests. We fail to see the distinction between a claim denied pretrial and one denied during trial. A petitioner must raise his claims on appeal in order to ensure habeas review.

VII.

Drayton's next claim is also barred. He argues that the trial judge's instructions reasonably could have been construed to require juror unanimity for finding mitigating circumstances. Because this issue was not raised at trial or on direct review, it is procedurally barred. The South Carolina Supreme Court refused to consider this issue on direct review. Drayton also argues that the state court's procedural bar rule is not consistently applied, which precludes our denial of habeas review on grounds of procedural bar. See Johnson v. Mississippi, 486 U.S. 578, 588-89 (1988). Drayton contends that the South Carolina Supreme Court sometimes hears claims that were not raised on direct appeal. To illustrate his point, Drayton cites the supreme court's acknowledgment in this case that it has not applied the rule with mechanical consistency. See Drayton v. Evatt, 430 S.E.2d at 520 ("Although we addressed direct appeal issues in Yates and Thompson, we did so without discussion or consideration of section 17-27-20(b) or the Simmons rule."); id. at 522-23 (Finney, J., dissenting) ("several of this court's recent decisions reveal that it has . . . addressed direct appeal issues during PCR review in both capital and non-capital cases."). We need not sort through the procedural argument because

13

Drayton's claim fails on the merits. See Eaton v. Angelone, 139 F.3d 990, 994 n.1 (4th Cir.) ("Because we agree with the district court's denial of Eaton's ineffectiveness claims on the merits, we need not resolve the thorny issue of procedural default."), cert. denied, 118 S. Ct. 2338 (1998). As the district court found:"[I]t is clear that the trial court's instruction that the verdict must be unanimous was not such as to give rise to a reasonable likelihood that the jury understood the mitigating factors instruction as having to be unanimously agreed upon by the jury." Drayton v. Evatt, C.A. No. 2:94-1608-23, slip op. at 52 (D.S.C. Mar. 5, 1998). We agree.

VIII.

Finally, Drayton argues that a South Carolina statute requires that the state supreme court conduct a "proportionality review" of all capital sentences.[10] The supreme court did not conduct such a review, he contends. The denial of that review, he continues, constitutes a due process violation of his rights to life and liberty.

The South Carolina post-conviction review court found that the state supreme court had performed its review correctly. The district court also concluded that "the Supreme Court's opinion reflects that it conducted an adequate proportionality review," noting that the court explicitly stated that "[t]his case consolidates Drayton's direct appeal and our mandatory review of the death sentence pursuant to S.C. Code Ann. § 16-3-25 (1985)." See State v. Drayton, 361 S.E.2d 329, 331 (S.C. 1987). In any case, such a claim is insufficient to merit granting the writ. See Buchanan v. Angelone, 103 F.3d 344, 351 (4th Cir. 1996), aff'd, 522 U.S. 269 (1998).

_____

[10] The statute provides that in a direct appeal in a capital case the supreme court shall determine:

> (1) Whether the sentence of death was imposed under the influence of passion, prejudice, or any other arbitrary factor, and (2) Whether the evidence supports the jury's or judge's finding of a statutory aggravating circumstance . . . and (3) Whether the sentence of death is excessive or disproportionate to the penalty imposed in similar cases, considering both the crime and the defendant.

S.C. Code § 16-3-25(c).

The judgment of the district court is

AFFIRMED.

MURNAGHAN, Circuit Judge, dissenting:

It is a well-established rule that when someone is accused of committing a crime, he need not prove his innocence. He may remain completely silent. See, e.g., Miranda v. Arizona, 384 U.S. 436, 468 n.37 (1966) ("The prosecution may not ... use at trial the fact that [defendant] stood mute or claimed his privilege [to remain silent] in the face of accusation."). The police and prosecutors bear the burden of proving his guilt beyond a reasonable doubt. See Sullivan v. Louisiana, 508 U.S. 275, 277-278 (1993). Those considerations are preeminently relevant in this case. The right of the accused to stand silent is accentuated by the Miranda rule that upon his request for counsel's advice all questioning by the police must cease until counsel has been afforded. Miranda, 384 U.S. at 474.

Obviously, the most effective procedure for the police and prosecutors to achieve a conviction is to secure a confession from the accused. Here, such a confession was obtained from Drayton, and it was generally recognized that it would have a substantial effect in favor of securing a conviction. The difficulty, however, is that the police secured that confession by continuing to interview Drayton about the event in question after he had announced his desire to be advised by counsel. Such continued interrogation violates the letter and spirit of the law.

I.

After twice invoking his right to silence,[1] Petitioner was taken to a bond hearing, or arraignment, where he maintains that he invoked his right to counsel. The magistrate judge presiding over the hearing

_____

[1] One of the arresting officers testified that, at his arrest, Drayton was advised of his Miranda rights and invoked his right to remain silent. The officers then took Drayton to the Charleston County Police Headquarters where he was again advised of his rights and, for a second time, invoked his right to remain silent.

15

clearly recalls that Petitioner intended to retain his own counsel. At the suppression hearing, she further testified that if a defendant states to her that he did not want an attorney, she would advise him that he would have to have an attorney. Consistent with the magistrate's testimony, two police officers who were present at the bond hearing further testified that when the magistrate offered Drayton a form to retain a public defender, he indicated that he did not want an appointed attorney. When asked, each officer declined to testify that Drayton did not desire any counsel at all.

After the hearing, Drayton was returned to police headquarters and taken directly to an interview room, where he was further interrogated by two police officers. While undergoing questioning by the officers, Drayton overheard the familiar voice of Officer Frazier, who was a prior acquaintance and friend of Drayton's family, and asked to speak with him. In his discussion with Frazier, Drayton made the incriminating statement at issue.

While the trial court did not explicate any clear factual findings before rendering its decision regarding the admissibility of Drayton's confession, the facts as articulated above were the basis of the court's decision and are either undisputed or the least favorable to Petitioner. Here, I afford the trial court's limited factual determinations the deference they are due. See Sumner v. Mata, 449 U.S. 539, 550 (1981) (determining that the trial court's factual findings are entitled to a presumption of correctness).

II.

Based on its factual findings, the state trial court found "that the defendant did not assert his right to counsel ...[and] that he, himself, initiated the giving of the statement to the police." Because "the statements made by the defendant were not as a result of any police-initiated interrogation," the court concluded, they were admissible at trial. While the trial court's factual findings are entitled to a presumption of correctness, see Sumner, 449 U.S. at 550, pure legal determinations and determinations of mixed questions of law and fact do not receive such deference. See Miller v. Fenton, 474 U.S. 104, 117-118 (1985) (noting, in a due process case, that "independent federal review has traditionally played an important parallel role in protecting

16

the rights at stake when the prosecution secures a conviction through the defendant's own admissions"). As the Supreme Court has observed, "the ultimate question of the admissibility of a confession merits treatment as a legal inquiry requiring plenary federal review." Id. at 115. The court of appeals is bound "`to make an independent evaluation of the record.'" Id. at 110. With this in mind, I do not challenge the trial court's apparent factual determinations. Rather, I dispute the court's application of clear legal principles to those facts. More specifically, I believe that the court's legal conclusions that (1) the presented facts do not establish that Drayton invoked his Sixth Amendment[2] right to counsel and that (2) Drayton "initiated" communication with law enforcement when he requested to speak with Officer Frazier are incorrect as a matter of law.

A.

Once an accused has exercised his right to remain silent, that assertion must be "scrupulously honored." Miranda, 384 U.S. at 479. Miranda dictates that if the accused indicates that he wants to remain silent or requests counsel, "the interrogation must cease." Id. at 474. His request for counsel is not limited to his decision to be represented by appointed counsel. To the contrary, "[a] defendant's statement that he intends to arrange representation is equivalent to a request for an attorney." Wilson v. Murray, 806 F.2d 1232, 1235 (4th Cir. 1986), cert. denied, 484 U.S. 870 (1987). In the case at bar, the presiding magistrate testified that, at the arraignment, Drayton indicated that he would secure his own attorney. The police officers' testimony that Drayton refused court-appointed counsel does nothing to impugn the magistrate's recollection that he desired legal representation. Indeed, her testimony is supported by the fact that the standard form, which Drayton would have signed had he waived the assistance of counsel,

_____

**2** The Sixth Amendment of the U.S. Constitution provides as follows: "In all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial, by an impartial jury of the State and district wherein the crime shall have been committed, which district shall have been previously ascertained by law, and to be informed of the nature and cause of the accusation; to be confronted with the witnesses against him; to have compulsory process for obtaining witnesses in his favor, and to have the Assistance of Counsel for his defence." U.S. Const. amend. VI.

17

was not in the clerk's file, and there is no evidence that such a waiver form was ever completed by Petitioner. Based on the uncontroverted evidence,[3] it seems obvious that Drayton invoked his right to counsel, as a matter of law.

Contrary to the majority's assertion, by so arguing, I do not enunciate a new constitutional rule, in violation of Teague v. Lane, 489 U.S. 288 (1989). In my judgment, the law as it existed at the time of Petitioner's conviction, and certainly as it exists now, dictates a ruling in his favor.

Assuming its application in the Sixth Amendment context, under Davis v. United States, 512 U.S. 452 (1994), the invocation of a defendant's right to counsel "requires, at a minimum, some statement that can reasonably be construed to be an expression of a desire for the assistance of an attorney." 512 U.S. at 459 (internal quotations omitted). The defendant "must unambiguously request counsel." Id. There is no evidence in the case at bar that Drayton's request was not unambiguous, and the trial court made no such finding. The magistrate did not testify that she believed that Drayton might secure counsel. Nor did she testify that Drayton was hesitant, indecisive, or equivocal in his request. She states, clearly, that she believed he would retain counsel and insists that if she thought otherwise she would have demanded that he secure the services of an attorney. Since the hearing was not transcribed (and the magistrate was not asked by either party during the suppression hearing), we do not know what Drayton said to give her that impression; we only know that it was her firm conviction that Drayton would retain his own attorney.

To invoke his right to counsel, Drayton need only "articulate his desire to have counsel present sufficiently clearly that a reasonable ... officer in the circumstances would understand the statement to be a request for an attorney." Id. The magistrate, an officer of the court, testified that she understood Drayton to make such a request. Her tes-

_____

**3** Petitioner Drayton, during the suppression hearing, did maintain that he requested appointed counsel when he appeared at the arraignment. Even assuming Drayton's contention to be false, however, the evidence supports the fact that he invoked his right to counsel by indicating to the magistrate that he intended to retain his own counsel.

18

timony is further supported by the absence of the standard waiver form in the clerk's file and the uncontroverted fact that Drayton had twice invoked his right to remain silent before the bond hearing. Combined, these facts compel a finding that Drayton invoked his right to counsel.

To the extent that there is any ambiguity, and I do not believe that there is, it is not in the magistrate's recollection of Drayton's intention to retain an attorney. Rather, the ambiguity noted by the majority is reflected in the words used by the magistrate to describe her own perception ("under the impression ...") -- words which were not employed to comment on the clarity of Drayton's request but were instead used to convey the magistrate's understanding of the events -- her expectation, her view, her belief. She expresses no uncertainty about the content of Drayton's intention. With this in mind and remembering our ultimate charge under the Constitution, i.e., ensuring that the accused's right to have the assistance of counsel for his defense is carefully protected, I am inclined to conclude that Petitioner legitimately invoked his right to counsel.

B.

Having expressed his intention to retain counsel, Drayton should not have been questioned further by the police. As the Supreme Court established in Edwards v. Arizona, 451 U.S. 477, reh'g denied, 452 U.S. 973 (1981), "an accused ... having expressed his desire to deal with the police only through counsel, is not subject to further interrogation by the authorities until counsel has been made available to him, unless the accused himself initiates further communication, exchanges, or conversations with the police." 451 U.S. at 484, 485 (discussing the Fifth Amendment privilege against self-incrimination). The Supreme Court subsequently applied Edwards to the Sixth Amendment and articulated an even stricter rule in Michigan v. Jackson, 475 U.S. 625 (1986). There, the Court held that if the police initiate interrogation after a defendant's assertion of his right to counsel at an arraignment, "any waiver of the defendant's right to counsel for that police-initiated interrogation is invalid." Jackson, 475 U.S. at 636 (emphasis added). The Court, in essence, created a binding presumption of invalidity for determining whether a waiver has, in fact, occurred. See Wilson, 806 F.2d at 1237.

19

In the present case, the trial judge found that Drayton's request to speak with Officer Frazier was "initiation," as contemplated by the Court in Edwards and Jackson. I do not dispute the judge's characterization of the facts, but that characterization, as a matter of law, does not constitute "initiation" on the part of Drayton. While a suspect's request to talk to a law enforcement agent is typically considered an "initiation" of communication by the suspect, United States v. Cummings, 937 F.2d 941, 946-47 (4th Cir.) (affirming trial court finding that suspect, from jail, initiated interview with police by requesting to talk to law enforcement agent), cert. denied, 502 U.S. 948 (1991), such a conclusion is nonsensical and contrary to the demands of the Sixth Amendment when an accused makes the request in response to police interrogation. It is undisputed that the officers were in the process of questioning Drayton when he heard Frazier's voice outside the interrogation room. Drayton did not request the contact with these officers, and when he eventually asked to speak with Frazier, he did not make the request from jail or a holding cell. Rather, he was undergoing active interrogation about the murder with which he had been charged. Drayton's request to speak to another officer, in the midst of that interrogation, can hardly be interpreted as "initiation" under any fair and just reading of the law. See generally Jackson, 475 U.S. at 633 (quoting Johnson v. Zerbst, 304 U.S. 458, 464 (1938), Court noted that "we should `indulge every reasonable presumption against waiver of fundamental constitutional rights.'").

At best, the officers' continued interrogation evidences a blatant disregard for the bright-line rule established by Edwards and Jackson. The police-initiated interrogation was intended to compel a statement from Drayton after he had exercised his right to silence and had requested counsel. This continued questioning, alone, violated Drayton's Sixth Amendment right to counsel. Drayton's subsequent request to speak to Frazier, which the officers could not have anticipated, was purely fortuitous.**4**

_____

**4** It is irrelevant that Drayton subsequently signed a written confession, after being advised of his right to counsel, and initialed a specific, written waiver of his right to counsel. The police improperly initiated an interrogation after Petitioner had requested counsel at his arraignment. Under Jackson, any waiver of Petitioner's rights for that police-initiated interrogation is invalid. 475 U.S. at 636. Even if Drayton's statement was voluntary, it was obtained in contravention of the clear dictates of Jackson.

Because Drayton expressed a desire to be represented by counsel at his bond hearing and because he did not initiate further contact with the police, his subsequent interrogation was impermissible under the Sixth Amendment. As a consequence, the confession that resulted from the interrogation was inadmissible and should have been suppressed. Since the appearance or non-appearance of the confession in the records of the court and before the jury had a substantial effect on the jury's outcome, as was recognized during oral argument, the error in admitting it as evidence can hardly be characterized as harmless. Therefore, I vote to reverse and remand the case for trial, excluding the confession as evidence. In so voting, it is not necessary for me to address other questions raised by Drayton since they can be considered at such subsequent trial, if indeed the questions arise.

21